# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF
### LOUISIANA

| | | |
|---|---|---|
| THEDA BANKS, | \| | Civil Action |
| Plaintiff, | \| | No. 3:17-cv-00193-SDD-RLB |
| v. | \| | |
| C. R. BARD, INC. AND BARD | \| | |
| PERIPHERAL VASCULAR, INC., | \| | |
| Defendants. | \| | |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In accordance with LR 56.2, Plaintiff hereby controverts Defendants' statement of material facts (Rec. Doc. 97-24) and includes a separate and concise statement of the material facts which the Plaintiff contends present genuine issues.

### I.    PLAINTIFF'S RESPONSES AND DISPUTES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

**GENERAL OBJECTION: Plaintiff objects to Defendants' editorialized summarization of their alleged facts and seeks to controvert this summarization to the extent it contains Defendants' conclusions, contains immaterial facts, and/or creates an incorrect impression by omitting contrary evidence and context. Plaintiff also objects to Defendants' citations to the record that are not to specific pages.**

1.    Bard develops, manufactures, and markets medical devices, including inferior vena cava ("IVC") filters, which Bard developed to prevent large blood clots in the deep veins of the body (deep vein thromboses or "DVT") from traveling to the heart or lungs and precipitating a life-threatening pulmonary embolism ("PE"). *See* Ex. 2, Oct. 2006 G2 IFU, at 1.

**RESPONSE:  Qualified. Plaintiff disputes the implication that Bard developed IVC filters, or that the G2 filter prevents PE, for which Bard provides no evidence. Plaintiff does not dispute that Bard developed the G2 filter, and that it is intended to reduce the risk of PE, as indicated by Bard's Exhibit 2 [Doc. 100-1].**

2.    PE can lead to chest pain, shortness of breath, and death. Ex. 3, Grassi, Clement, et al., "*Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*," 12 J. of Vascular and Interventional Radiology 137, 137 (2003); Ex. 4, *ACR-SIR-SPR Practice Parameter for the Performance of Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism*, 2017.

**RESPONSE:  Qualified. The exhibits cited do not provide evidence of these facts. Plaintiff does not dispute, however, that PE can, but does not always result in pain, shortness of breath, or death.**

3.    Medical literature reports "estimates of the incidence of nonfatal PE range from 400,000 to 630,000 cases per year, and 50,000 to 200,000 fatalities per year are directly attributable to PE." Ex. 3, Grassi, Clement, et al., "*Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*," 12 J. of Vascular and Interventional Radiology 137, 137 (2003).

**RESPONSE: Qualified. While the statement that medical literature reports the quoted statement is accurate, Plaintiff disputes the relevance. The literature referenced is from 25-45 years ago, and is does not apply today, where treatment options for pulmonary embolism have improved substantially. Doc. 100-2, p. 1 (citing references 1-4); p. 5 (indicating references 1-4 are from 1975-1996).**

4.   FDA originally classified IVC filters as Class III devices, but beginning in 1995, FDA required IVC filter manufacturers to submit summaries of known safety and effectiveness information for FDA to determine whether to reclassify the devices. Ex. 5, Dec. 2, 1996, FDA Reclassification of Cardiovascular Intravascular Filters, at 1–4.

**RESPONSE: Admitted.**

5.   In a final rule dated March 31, 2000, FDA down-classified IVC filters from Class III to Class II, amending 21 C.F.R. § 870.3775 and incorporating special controls, including an FDA Guidance document entitled "Guidance for Cardiovascular Intravascular Filter 510(k) Submission," that was intended to identify important preclinical tests and clinical design considerations for these devices. 65 Fed. Reg. 17138, 17144 (FDA Mar. 31, 2000); Ex. 6, Nov. 26, 1999, FDA Guidance for Cardiovascular Intravascular Filter 510(k) Submissions.

**RESPONSE: Qualified. Plaintiff does not dispute that the FDA reclassified IVC filters as Class II devices and incorporated the referenced FDA guidance. Plaintiff disputes that the guidance was "intended to identify important preclinical tests and clinical design considerations for these devices," as Defendants have provided not specific citation to evidence proving this statement. To the contrary, the FDA considered the information in the guidance to be "recommendations," and an "outline" of tests whose "goal" it was to "identify objective(s)" of tests. Doc. 100-5, pp. 4, 6. As relevant to Defendants' motion, the FDA did create a requirement that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." *Id.* at 8.**

6.   The G2 filter was cleared by the United States Food and Drug Administration ("FDA") through the 510(k) process outlined in the Food, Drug and Cosmetic Act ("FDCA"); the G2

Filter was cleared for use in patients as a permanent device on August 29, 2005 and then as a retrievable filter on January 15, 2008. Ex. 7, August 29, 2005, FDA Clearance Letter; Ex. 8, January 15, 2008, FDA Clearance Letter.

**RESPONSE: Qualified. In 2008, the G2 filter was cleared for permanent placement with the option to remove it. Doc. 100-7, p. 4.**

7.    The G2 filter is conical in shape and consists of a main shaft to which twelve struts (six "arms" and six "legs") are attached. *See* Ex. 2, Oct. 2006 G2 IFU, at 1, 3.

**RESPONSE: Admitted.**

8.    Once the G2 filter is implanted percutaneously into the IVC, the largest vein in the human body, the filter's arms and legs open and anchor it to the IVC walls, acting to prevent blood clots from flowing into the lungs and causing sudden death. Ex. 2, Oct. 2006 G2 IFU, at 1, 3.

**RESPONSE: Qualified. The exhibit cited does not provide evidence that the IVC is the largest vein in the human body, or that the G2 filter arms and legs "anchor" into the IVC walls, or that the G2 filter will prevent blood clots or sudden death. To the contrary, Defendants' filters had higher frequencies of pulmonary embolism, death from pulmonary embolism, filter migration, death from filter migration, and fatality than most other filters. Ex. A. Plaintiff does not dispute that the G2 filter is inserted percutaneously into the IVC, or that it was intended to prevent PE.**

9.    IVC filters, such as the G2 filter, are often used in patients who, like Ms. Banks, have had prior episodes of DVT or blood clots, are not candidates for anticoagulation medication, and to address the risk of potentially life-threatening PE. Ex. 2, Oct. 2006 G2 IFU, at 1, 3; Ex. 11, June 29, 2021 Deposition of Scott Schuber, M.D. ("June 29, 2021 Schuber Dep.") 51:5–53:5; Ex. 13,

Theda Banks Plaintiff Profile Form ("PPF") § 3.E. (stating that her "filter placed after being diagnosed with Deep Vein Thrombosis/Pulmonary Embolism").

> **RESPONSE: Qualified. Plaintiff does not dispute that among patients who receive filters, they are often as described above. Plaintiff disputes, and Defendants have not provided evidence that patients matching this description "often" received a filter or a G2 filter.**

10.    The G2 filter is a prescription medical device, sold only to physicians and not directly to patients. Ex. 7, Aug. 29, 2005, FDA Clearance Letter; Ex. 8, January 15, 2008 FDA Clearance Letter; Ex. 2, Oct. 2006 G2 IFU, at 1.

> **RESPONSE: Qualified. Plaintiff admits the statement but disputes that Defendants' representations and warranties about its filters are not communicated to Plaintiff through physician. Defendants have provided no such evidence.**

11.    When Ms. Banks was treated with her G2 filter in October 2007, it was widely discussed in the medical literature that all IVC filters carry certain risks of complications, including filter tilt, migration, and IVC perforation. *See* Ex. 3, Grassi, Clement, et al., "*Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*," 12 J. of Vascular and Interventional Radiology 137 (2003); *see also* Ex. 9, C.E. Ray Jr., et al., *Complications of inferior vena cava filters*, Abdominal Imaging (1996) at 371–73 (discussing filter fracture, IVC perforation, and other complications).

> **RESPONSE: Disputed. The literature cited is from 1996 and earlier, not "at the time Ms. Banks was treated with her G2 filter." The G2 filter and other available options in 2007 had not been developed when the literature cited was published. Moreover, the literature cited does not indicate that all filters carry risks of complications, nor**

**that they are all equivalent. To the contrary, when the FDA determined in 2000 that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." Doc. 100-5 at 8.**

12.     When Ms. Banks was treated with her G2 filter in October 2007, her implanting physician, Dr. Scott Schuber, M.D., was aware that all IVC filters, including the G2 filter he implanted in Ms. Banks, carry certain risks of complications, including filter tilt, migration, and IVC perforation. Ex. 11, June 29, 2021 Schuber Dep. 32:25–33:21; Ex. 12, Dec. 16, 2021 Schuber Dep. 16:10–17:3; 101:14–102:9; 102:14–103:1; 112:13–113:12.

> **RESPONSE: Disputed. Defendants' statements are misleading by omission. Dr. Schuber testified that filters have a "potential" risk of migration. Ex. B, Schuber Deposition, June 29, 2021 at 32:14-21. He also understood that while there are "potential" risks, documented years ago with older filters (see, e.g., response to paragraph 11, above), "Over the last many, many years, . . . there have been advancements, of course, in the devices where . . . they are able to remain more stable." Ex. C, Schuber Deposition, Dec. 16, 2021, at 16:24-17:2. Although he was aware of "general" risks that could occur in "theory", he believed them to be "rare". *Id.* at 102:11-12. The frequency of risk was also important to him. *Id.* at 112:21-24 ("they were generally known. It goes without saying we would always want to know or identify if there was a specific product that had a propensity to do that more so than others.").**

13.     Dr. Schuber knew of the risks inherent in IVC filters—including filter tilt, migration, and IVC perforation—when he implanted Ms. Banks's filter in October 2007 but decided that the

G2 filter's benefits outweighed these risks. Ex. 11, June 29, 2021, Schuber Dep. 32:25–33:21;

90:1–18; Ex. 12, Dec. 16, 2021 Schuber Dep. 100:6–15; 101:14–102:9.

> **RESPONSE: Disputed. This statement is also misleading by omission. Dr. Schuber**
> **was generally not aware of problems with the G2 filter. Ex. B, Schuber Deposition,**
> **June 29, 2021 at 30:21-31:4, 33:6-8 ("Q. Was there anything about the G2 and its**
> **history . . . where the company had recognized that it had a higher risk and a higher**
> **potential to migrate, tilt, and perforate? . . . A. That's not information I had, no. . . .**
> **So again, at the time, I was not aware of any additional risks specific to the G2**
> **filter.").**
>
> **This was, however, information that Dr. Schuber would have wanted to know.** *Id.* **at**
> **62:14-63:2 ("But in general terms, if a serious problem was identified with a device**
> **we were using, yeah, I'd want to know about it.");** *id.* **at 92:14-24 ("Q . . . I think**
> **you're saying if you knew a device had a . . . higher risk of complications compared**
> **to other devices on the market, you would not get to the informed consent because**
> **you probably would not use that device. Is that fair? A. Right. That's what I'm**
> **getting at. I would have a hard time consenting a patient to say that, I'm about to**
> **put something in you that is more dangerous than an alternative.");** *id.* **at 112:16-18**
> **("if I truly knew a device was significantly riskier than any other alternative, I would**
> **choose another device."); Ex. C, Schuber Deposition, December 16, 2021 at 10:9-23**
> **("Q. Had Bard advised you prior to use of the device in Ms. Banks that they were**
> **having some problems with the device from a patient-safety standpoint, that there**
> **was some design issues that they needed to fix because of their concern that the**

**design of the G2 was making the device more prevalent to serious injuries and deaths to the point that they felt it was unacceptable, would that have influenced you to not use the G2 filter on Ms. Banks? . . . A. . . . If any device manufacturer came to me with that information, yeah, I would have reservations about using any device in that circumstance.");** *id* **at 112:21-24 ("It goes without saying we would always want to know or identify if there was a specific product that had a propensity to do that more so than others.").**

14.    When he implanted Ms. Banks's filter in October 2007, Dr. Schuber knew that the risks inherent in IVC filters—including filter tilt, migration, and IVC perforation, could lead to death or serious injury. Ex. 11, June 29, 2021 Schuber Dep. 32:25–33:21; 90:1–18; Ex. 12, Dec. 16, 2021 Schuber Dep. 16:10–17:3; 102:14–103:1; 112:13–113:12.

> **RESPONSE: Qualified. While Plaintiff does not controvert that Dr. Schuber so testified, the statement is misleading by omission because of the testimony quoted in paragraph 13, above. Moreover, according to Dr. Muehrcke, "it was impossible for implanting doctors to determine the risk benefit ratio associated with implanting the Bard IVC filters as Bard was unable to determine any risk benefit ratio; and as the benefit of the Bard filters was not ever proven." Muehrcke Report [Doc. 110-14], at 12-13.**

15.    Dr. Schuber learned of the risks inherent in IVC filters—including filter tilt, migration, and IVC perforation—through his fellowship, residency, practice experience, interaction with colleagues, and other various sources. Ex. 11, June 29, 2021 Schuber Dep. 14:15– 23; Ex. 12, Dec. 16, 2021 Schuber Dep. 27:2–12.

**RESPONSE: Qualified. Dr. Schuber learned about the risks generally, of IVC filters in his training. He believed those risks to be "rare". Ex. C, Schuber Deposition, Dec. 16, 2021 at 102:11-12. He also reviewed the G2 instructions for use. Ex. D, Schuber Affidavit, ¶ 13. He was also not aware in 2007 of the true nature of those complications because Defendants omitted and concealed information about the G2's relatively high failure rates. Plaintiff's experts have explained the numerous ways in which Bard failed to adequately convey the full nature of risks associated with the G2 filter. Dr. Muehrcke opined:**

**1.      Bard did not provide critical information to physicians (via its information for use packet or through its sales representatives), all which directly relate to the safety profile/risks associated with its IVC filters.**

**2.      The IFU in use when Ms. Banks filter was implanted was not based on the Bard G2 filter failure modes as there were no studies published to show the new problems the G2 filter exhibited (caudal migration leading to tilt, and perforation).**

**3.      Bard IFU used old reports in the literature to report generic and inaccurate risks they ascribed to the Bard G2.**

**4.      Bard *knew* their G2 filter had a "critical problem with caudal migration, tilt and perforation well before Ms. Banks got her IVC filter. Muehrcke Report [Doc. 110-14], at 13 (emphasis added).**

16.    Dr. Schuber recognized when he implanted Ms. Banks's filter in October 2007 that just because a medical device experiences a known complication does not mean the device is defective. Ex. 12, Dec. 16, 2021 Schuber Dep. 66:16–23; 66:25–67:16; 67:25–68:6.

**RESPONSE: Disputed. Dr. Schuber testified that one of the possibilities that leads to complications on a patient includes "….a lot of things, [including] a defect in the device." Ex. C, Schuber Deposition, Dec. 16, 2021 at 18:19-25 – 19:3-7.**

17. Dr. Schuber testified that it is possible for the complications Ms. Banks experienced to occur absent a defect. Ex. 12, Dec. 16, 2021 Schuber Dep. 66:16–23; 66:25–67:16; 67:25–68:6.

**RESPONSE: Dr. Schuber testified that one of the possibilities that leads to complications on a patient includes "….a lot of things, [including] a defect in the device." Ex. C, Schuber Deposition, Dec. 16, 2021, at 18:19-25 – 19:3-7.**

18. FDA has long recognized that the risks of filter migration (reported at rates from 6% to 53%), IVC perforation (reported at rates up to 9%), and filter tilt are associated with all brands of IVC filters, noting that these risks these risks are "well known to the users" (i.e., doctors who implant IVC filters) and "well characterized in the medical literature." Ex. 5, Dec. 2, 1996, FDA Reclassification of Cardiovascular Intravascular Filters, BPV-17-01-00262283–88; Ex. 6, Nov. 26, 1999, FDA Guidance for Cardiovascular Intravascular Filter 510(k) Submissions, BPV- 17-01-00034593–602.

**RESPONSE: Disputed. The cited evidence indicates that the FDA was referring to rates associated with filters in the 1980s and 1990s. Doc. 100-4, pp. 6, 7, 9-10. Moreover, the literature cited does not indicate that all filters carry risks of complications, nor that they are all equivalent. To the contrary, when the FDA determined in 2000 that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." Doc. 100-5 at 8. Additionally, to the extent the FDA statements are to be credited as relevant, the statements indicate that migration and perforation are because of the design of the filter, essentially an**

**admission by Defendants that if its filter migrates or perforates, it is due to a defective design. Doc. 100-4, pp. 6, 7. The cited documents do not provide information about the frequency of migration and perforation associated with filters in 2007 (other than the G2, which generally performed worse than competitor filters), nor what doctors expected in 2007.**

19.    The Society of Interventional Radiology ("SIR"), an international organization of over 5,000 physicians who work with IVC filters, published a report in 2003 following a 2-year study that stated permanent-only IVC filters have been associated with IVC perforation up to 41% of the time and migration up to 18% of the time. *See* Ex. 3, Grassi, Clement, et al., "*Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*," 12 J. of Vascular and Interventional Radiology 137 (2003), Tables I & II; *see also* Ex. 9, C.E. Ray Jr., et al., *Complications of inferior vena cava filters*, Abdominal Imaging (1996) at 371–72.

**RESPONSE: Disputed. The frequencies reported by the paper cited were not for "permanent-only" filters as a class, but simply about rates reported in the literature in the 1980s and 1990s about specific filters that were on the market then, but were generally not among the filters available in 2007. Doc. 100-2, pp. 4, 5-6. Moreover, the literature cited does not indicate that all filters carry risks of complications, nor that they are all equivalent. To the contrary, "Complication rates are highly variable depending on the filter being studied." Doc. 100-3, p. 13. And when the FDA determined in 2000 that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." Doc. 100-5 at 8.**

**Plaintiff further disputes that a published rate provide information about what was "known" generally. Dr. Schuber testified that he did not read the SIR guidelines. Ex. D, Schuber Affidavit, ¶ 16. Plaintiff further disputes that "Reported Rates" based on published studies can be compared with spontaneous reports from the FDA database of filter failures. For example, the 2017 publication states that the data provided does not represent "the SIR standard for complications." Doc. 100-3, p. 14. To the extent that any comparison is made, spontaneous reports should be multiplied by 20 to 100. Ex. E, Ciavarella Dep, at 130:14-131:23 ("general consensus" that only 1-5% of adverse events are voluntarily reported).**

20.   The SIR Guidelines are updated periodically with each revision reiterating that all IVC filters carry risks of complication. Ex. 4, *ACR-SIR-SPR Practice Parameter for the Performance of Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism*, 2017.

**RESPONSE: Disputed. The statement does not appear in the evidence cited. Plaintiff does not dispute that the "Practice Parameters" are updated periodically. Plaintiff disputes that the document indicate "risk", because the information provides "Reported Rates," instead. Moreover, the literature cited does not indicate that all filters carry risks of complications, nor that they are all equivalent. To the contrary, when the FDA determined in 2000 that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." Doc. 100-5 at 8. Plaintiff disputes that the cited sources provide risks; instead, the cited papers provided "Reported Rates." Plaintiff further disputes that the papers**

**provide rates for "all IVC filters." To the contrary, "Complication rates are highly variable depending on the filter being studied." Doc. 100-3, p. 13.**

21.    In 2016, the SIR, the American College of Radiology, and Society of Pediatric Radiology published an update to the *Quality Improvement Guidelines*, entitled *ACR-SIR-SPR Practice Parameter for the Performance of Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism*. This update analyzed both permanent-only IVC filters and retrievable IVC filters and found that IVC perforation is reported at rates up to 100%, though "clinically significant" rates are unknown, filter migration is reported at rates up to 25%. Ex. 4, *ACR-SIR-SPR Practice Parameter for the Performance of Inferior Vena Cava (IVC) Filter Placement for the Prevention of Pulmonary Embolism*, 2016, p. 13.

> **RESPONSE: Disputed. The literature cited does not indicate that all filters carry risks of complications, nor that they are all equivalent. To the contrary, "Complication rates are highly variable depending on the filter being studied." Doc. 100-3, p. 13. Moreover, the "25% reported rate for migration" appears to be <u>because of the G2 </u>filter. For example, reference 76 is the Deso paper. (Deso et al., "Evidence-Based Evaluation of Inferior Vena Cava Filter Complications Based on Filter Type," Seminars in interventional radiology 2016;33:93-100) (available at <u>https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4862854/</u>) (last visited August 12, 2022). It reported: "Conical Bard filters were associated with the highest reported risks of fracture (40 %)," and G2 migration rates of 12-25%. *Id.* at 93, 96. (citations omitted).**

**And when the FDA determined in 2000 that if a clinical study is conducted it should be "to demonstrate that the rates of complications for the investigational filter [i.e., the G2 filter] are comparable to other marketed vena cava filters." Doc. 100-5 at 8.**

22.    On August 9, 2010, FDA issued a Safety Alert about all IVC filters stating: "Known long term risks associated with IVC filters include but are not limited to lower limb deep vein thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC Perforation." Ex. 10, Food and Drug Administration Safety Alert, *Inferior Vena Cava (IVC) Filters: Initial Communication: Risk of Adverse Events with Long Term Use* (2010).

**RESPONSE: Admitted.**

23.    The IFU that accompanied Ms. Banks's G2 filter contains a bolded section entitled "**Warnings**," which includes the following bolded warnings:

> **Movement or migration of the filter is a known complication of vena cava filters. This may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in the IFU. Migration of filters to the heart or lungs have been reported in association with improper deployment, deployment into clots and/or dislodgment due to large clot burdens.**

(Ex. 2, Oct. 2006 G2 IFU, at 1) (emphasis in original). These same warnings are repeated in the "**Potential Complications**" section. (*Id.*)

**RESPONSE: Qualified. Although the quotation is accurate, the warnings are not specific, instead referencing "vena cava filters" generally, which misleadingly suggests that the frequencies and severities associated with filter failures in the G2 filter are similar to those in other filters. Moreover, the reasons given for migration (improper placement or deployment, and dislodgment due to large clot burdens) do not describe what happened to Ms. Banks' filter. The G2 Instructions for Use do not**

warn that a filter can, as occurred here, severely tilt, migrate downward and perforate into Ms. Banks' pancreas and aorta, causing right upper quadrant pain, and flank pain and requiring open surgery to remove. Doc. 100-14, p. 12.

To the extent Bard relies on this purported fact to imply or argue that the warning was adequate, this is contradicted by the following evidence available to Bard at the time Ms. Banks received her filter in 2007:

- Bard had identified downward migration as a particular risk with this filter, which is not mentioned in the cited instructions, had developed a design to reduce the risk of caudal migration that could be introduced into the market by the end of 2006, but determined to delay that introduction and instead focus on getting the FDA to clear the filter for retrieval, which would increase its market share. (Ex. F, p. 1).

- Bard also determined that it needed a new bench test to assess downward migration. (Ex. G, p. 1).

- Bard determined that downward migration was a "critical" issue and could interfere with the G2 filter's ability to prevent blood clots and that the rate of migration was "unacceptable". (Ex. H, p. 1; Ex. I, p. 20).

- Bard also misled the FDA by claiming that the clinical threshold was a migration rate of 2% (based on published studies), and misleadingly compared this to its internal reporting rate at 0.129% (and without adjustment for the fact that the denominator here—sales—would misleadingly include filters which had not yet been implanted or where there had not been any opportunity to detect a

migration). **(Ex. J, p. 46). Bard further instructed its sales representatives to tell physicians that caudal migration occurred in less than 1 in 1,000 G2 filters. (Ex. K, p. 5). A few months earlier, however, a presentation to management indicated that in the only clinical trial of the G2 filter, caudal migration had occurred in 66% of retrieved filters (Ex. L, p. 12).**

- **In the same study, one of the only medical doctors evaluating the results, discussed with Bard: 1) stopping the study because of adverse events, 2) redesigning the filter, and 3) ultimately told his hospital not to use the G2 filter. (Ex. M, p. 2; Ex. M2, p. 2; Ex. M3, p. 1).**

- **Also in the EVEREST study, Bard learned about two fractures (in one patient) in June 2006. (Ex. N, p. 899). The overall fracture rate in the study was calculated as 1 out of 83 (or 1.2%, with a statistical range up to 6.5%, id. at 799), but at that time the rate would have been higher because not all 83 subjects had been evaluated (and there were in fact two fractures), leading to a statistical frequency of at least 13%.**

- **The same month, Bard interviewed key opinion leader physicians, who explained that fractures should occur in less than one in 1,000 filters; they "prefer 1 in 10,000 (0.1%). (Ex. O, p. 1).**

**Moreover, the G2 Instructions for Use do not provide any warning that it could tilt, that perforation could injure a patients' pancreas and aorta, that tilt and perforation would require an open surgical procedure, and that the cap could embed into the wall of the IVC, that the cap and be impossible to remove, and that struts would also be embedded in a patient's IVC. There was also no warning that all of the above**

**malfunctions would require the placement of additional medical devices in in a patient, with their own attendant risks.**

24.    The "**Potential Complications**" section of the IFU that accompanied Ms. Banks's G2 filter also includes warnings of, "Perforation or other acute or chronic damage of the IVC wall" (Ex. 2, Oct. 2006 G2 IFU, at 1). The IFU then states, in bolded text: "**All of the above complications have been associated with serious adverse events such as medical intervention and/or death**." (*Id.*)

> **RESPONSE: Qualified. Although the quotation is accurate, the warnings are not specific, instead referencing "vena cava filters" generally, which misleadingly suggests that the frequencies and severities associated with filter failures in the G2 filter are similar to those in other filters. Moreover, the precautions do not describe what happened to Ms. Banks' filter. The G2 Instructions for Use do not warn that a filter can, as occurred here, severely tilt, migrate downward and perforate into Ms. Banks' pancreas and aorta, causing right upper quadrant pain, and flank pain and requiring open surgery to remove. Doc. 100-14, p. 12.**

25.    In his depositions in this case, Dr. Schuber unequivocally testified that he did not read the G2 IFU either before he implanted Ms. Banks's filter or at any other time before his depositions. Ex. 11, June 29, 2021 Schuber Dep. 138:1–8; Ex. 12, Dec. 16, 2021 Schuber Dep. 130:8–10.

> **RESPONSE: Disputed. Dr. Schuber was, in fact, equivocal. After the testimony cited, he stated "And just for the record, I'm not trying to make light of proper technique for inserting this device or any other. I was mainly just making a joke." Ex. B, p. 138:22-25. His later testimony that he did not recall a particular version of the G2 instructions for use does not mean that he never reviewed it. Doc. 100-11, 130:8-10.**

**More recently, Dr. Schuber testified that he was provided the G2 Instructions for Use during his training. Ex. D, Schuber Affidavit, ¶ 13.**

**Additionally, Mr. Morton, the sales representative who sold the G2 filter to Dr. Schuber specifically remembered Dr. Schuber, attended G2 implantation procedures, and specifically to assist doctors in following the Instructions for Use. Ex. Y, Morton Deposition, 38:18-39:22. Mr. Morton visited Dr. Schuber twice per month.** *Id.* **at 139:8-12.**

**Mr. Morton testified that it was "part of [his] job to communicate to doctors all of the risks of the G2" filter.** *Id.* **at 46:23-47:3.**

**Mr. Morton also testified that he communicated to doctors that the G2 filter was less likely to tilt than the Simon Nitinol filter.** *Id.* **at 62:22-63:12.**

26.    Dr. Schuber testified that he "never read" the G2 filter IFU or any manufacturers' IFUs because "[t]hat's what going to med school and fellowship's for." Ex. 11, June 29, 2021 Schuber Dep. 138:1–8.

**RESPONSE: Disputed. Dr. Schuber in fact reviewed the G2 IFU. Ex. D, Schuber Affidavit, ¶ 13.**

27.    Although Dr. Schuber had never read the G2 filter's IFU before his depositions in this case, when presented with the IFU in his depositions he agreed that it warned of every complication that came to pass with Ms. Banks's filter. Ex. 12, Dec. 16, 2021 Schuber Dep. 137:10–22).

**RESPONSE: Disputed. Dr. Schuber in fact reviewed the G2 IFU. Ex. D, Schuber Affidavit, ¶ 13. Moreover, he was not aware that the G2 had a higher frequency of failures compared with other filters. Ex. C, Schuber Deposition, Dec. 16, 2021, 27:20-23. And the relevant G2 Instructions for Use do not warn that a filter can, as occurred here, severely tilt, migrate downward and perforate into Ms. Banks' pancreas and aorta, causing right upper quadrant pain, and flank pain and requiring open surgery to remove. Doc. 100-14, p. 12. Defendants have not provided evidence in the record that Dr. Schuber was aware of the specific failures that occurred with Ms. Banks' filter.**

28.    Dr. Schuber has never read any G2 filter brochure, any "Dear Doctor" letters from Bard, or any emails or presentations sponsored by Bard. Ex. 11, June 29, 2021 Schuber Dep. 138:9–12.

**RESPONSE: Disputed. The cited testimony provides no information about the G2 filter Brochure. To the contrary, Dr. Schuber testified that sales representatives "usually would have some brochures." Ex. B, Schuber Deposition, June 29, 2021, 63:25-64:5. Bard provides no evidence in the record that Dr. Schuber was ever sent a "Dear Doctor" letter, which is another method of providing an adequate warning to doctors. Moreover, Dr. Schuber testified that he cannot recall whether the information that he received about the Bard filters came from filter brochures, "Dear Doctor" letters or any emails or presentations sponsored by Bard. Ex. C, Schuber Deposition, Dec. 16, 8:20-24.**

29.    Dr. Schuber has never been trained by Bard (or any other IVC filter manufacturer) regarding implanting filters. Ex. 12, Dec. 16, 2021 Schuber Dep. 116:22–117:2.

**RESPONSE: Qualified. Dr. Schuber testified that he did not receive training from Bard. He did, however, receive the G2 Instructions for Use and the G2 brochure. Ex. D, Schuber Affidavit, ¶ 13; Ex. B, Schuber Deposition, June 29, 2021, 63:25-64:5.**

30.    Before implanting Ms. Banks's filter in October 2007, Dr. Schuber does not remember any specific conversations with any Bard sales representative or other Bard representative. Ex. 11, June 29, 2021 Schuber Dep. 56:8–58:3; 58:13–59:6; 99:21–100:10.

**RESPONSE: Admitted.**

31.    Ms. Banks has reviewed no literature published by Bard or spoken with anyone from Bard. Ex. 14, May 18, 2021 Deposition of Theda Banks ("Banks Dep.") 31:19–32:16.

**RESPONSE: Qualified. Ms. Banks did not receive information directly from Bard. She did, however receive information from Dr. Schuber about the G2 filter, who received it from Bard. Ex. B, Schuber Deposition, June 29, 2021, 29:9-31:10 (purpose of informed consent conversation with patient is to explain to her the risks and benefits of the device; Dr. Schuber did not have information at the time that G2 was more likely to migrate or perforate).**

32.    Ms. Banks had never heard of Bard before this lawsuit and did not know Bard manufactured her G2 filter. Ex. 14.

**RESPONSE: Admitted.**

33.    In consenting to having her filter implanted, Ms. Banks relied only on Dr. Schuber's treatment decisions, not on any Bard literature or warranty. Ex. 14, Banks Dep. 144:7–22.

**RESPONSE: Qualified. Ms. Banks relied on Dr. Schuber to provide information about the G2 filter, who in turn relied on Bard. Ex. B, Schuber Deposition (June), 29:9-31:10 (purpose of informed consent conversation with patient is to explain to**

**her the risks and benefits of the device; Dr. Schuber did not have information at the time that G2 was more likely to migrate or perforate).**

34. In support of her claims, Ms. Banks disclosed one "case-specific retained expert," a cardiothoracic surgeon named Dr. Derek Muehrcke, M.D. Ex. 15, Derek Muehrcke, M.D. Expert Report and Disclosure for Theda Banks ("Muehrcke Rep."); Ex. 17, Pl.'s Disclosure of Expert Testimony Pursuant to Rule 26(a)(2) ("Pl.'s Expert Discl.") pp. 10–11.

    **RESPONSE: Admitted.**

35. Dr. Muehrcke is a medical doctor, not an engineer. *See* Ex. 15, Muehrcke Rep. pp.2–3.

    **RESPONSE: Admitted.**

36. Dr. Muehrcke states in his expert report that G2 filters have risks of certain complications, that all IVC filters carry risks, and that the risks associated with Ms. Banks's filter "increased after it was implanted to the point where it failed by tilting, caudally migrated, perforating her IVC in multiple areas." Ex. 15, Muehrcke Rep. p. 12.

    **RESPONSE: Qualified. The quotation is accurate, but incomplete. The sentence concludes: " . . . one of which was perforating her pancreas, her aorta, causing right upper quadrant pain, and flank pain." *Id.* Plaintiff disputes that the cited evidence indicates that "all IVC filters carry risks." To the contrary, Dr. Muehrcke opined that Bard knew the "G2 filter was failing in an unique fashion (caudal tilt, perforation, and migration)," but "it would take years before the medical literature would liberate the troth what Bard was suppressing . . . Years later both Dr. Schuber and Dr. Schwartzberg stopped using the G2 filter out of concerns for the novel failure modes of the Bar G2 filter". *Id.* Dr. Muehrcke opined that "[t]he G2 filter fails in a cascade of multiple failure modes at a high rate" and that "Bard knew it**

had a 'critical' problem with the G2 migrating caudally and that a 'high percentage of caudal migrations were accompanied by a significant filter tilting and limb displacement.'" *Id.* at 13, 17.

37. Dr. Muehrcke stated in his expert report that the G2 has higher complication rates than other filters and testified in his deposition that "no other filter fails like the G2 filter in the cascade of caudal migration, tilt, perforation." Ex. 15, Muehrcke Rep. pp. 13–18; Ex. 16, July 2, 2022 Deposition of Derek Muehrcke, M.D. ("Muehrcke Dep.") 48:17–49:11.

> **RESPONSE: Admitted.**

38. In his report and deposition, Dr. Muehrcke does not tie Ms. Banks's alleged injuries to any specific defect in the G2 filter. Ex. 15, Muehrcke Rep. pp. 11–25; Ex. 16, Muehrcke Dep. 48:17–49:17.

> **RESPONSE: Disputed. Dr. Muehrcke opined that "[t]he new G2 design led to a cascade of filter failures including caudal migration, tilt, perforation; all of which occurred in Ms. Banks." Doc. 100-14, Muehrcke Rep. p. 17. He further testified that "From a medical perspective, there is no cause of these failures other than the design defects described by Dr. McMeeking." *Id.* at 25.**

39. Although Ms. Banks indicated in her PPF that one of her alleged failure modes was filter fracture, Dr. Muehrcke did not identify fracture in his expert report or his deposition as one of the complications Ms. Banks allegedly experienced. *See* Ex. 15, Muehrcke Rep. p. 12 (stating that Ms. Banks's filter "failed by tilting, caudally migrat[ing], and perforating her IVC"); Ex. 13, PPF § 4.

> **RESPONSE: Admitted.**

40. Ms. Banks has also disclosed "general liability" experts who were previously disclosed in the Bard IVC filter MDL. Ex. 17, Pl.'s Expert Discl. pp. 2–10.

**RESPONSE: Admitted.**

41.    Robert M. McMeeking, Ph.D., an engineering expert who offered alternative design opinions in the Bard IVC filter MDL, is one of the "general liability" experts Ms. Banks disclosed here. Ex. 17, Pl.'s Expert Discl. p. 3.

**RESPONSE: Admitted.**

42.    Dr. McMeeking did not prepare a case-specific report for Ms. Banks's case. *See* Ex. 17, Pl.'s Expert Discl. p. 3 (listing Dr. McMeeking as a "general liability" expert and stating that his qualifications and opinions and the bases of his opinions are those that were disclosed in the MDL and in *Barraza*, and referencing a case-specific report that was never served).

**RESPONSE: Admitted.**

43.    Dr. McMeeking contends that the Simon Nitinol Filter ("SNF") and other permanent-only filters are alternative designs to the G2 filter. Ex. 20, July 6, 2017 Deposition Tr. of Dr. Robert M. McMeeking, Ph.D. ("July 6, 2017 McMeeking Dep.") 221:16–24.

**RESPONSE: Admitted.**

44.    For another proposed alternative design, Dr. McMeeking contends that Bard could have changed the G2 filter's design by adding caudal anchors, penetration limiters, two-tiered design, and a better (smoother and rounded) chamfer at the mouth of the "cap" on its filters. (Ex. 18, *Jones v. C. R. Bard, Inc.* Trial Tr., ("McMeeking Jones Trial Tr.") at 444:5–8, 452:11–19 (D. Ariz. May 16, 2018); Ex. 19, *Hyde v. C. R. Bard, Inc.* Trial Tr. ("McMeeking Hyde Trial Tr."), at 634:19–22 (D. Ariz. Sept. 20, 2018); Ex. 20, July 6, 2017 McMeeking Dep. 32:6–33:8 (opining that Bard could have incorporated caudal anchors and penetration limiters sooner than it ultimately did in its later generation filters); Ex. 21, January 8, 2020 MDL Preservation Deposition of Robert M. McMeeking, Ph.D. ("McMeeking Preservation Dep. Vol. I") at 256:4–

257:13 (suggesting two- tiered design of the Simon Nitinol Filter, caudal anchors, penetration limiters, and design changes to shape to improve strain concentrations)).

   **RESPONSE: Admitted.**

45.    Dr. McMeeking admits that his proposed alternative design—adding anchors, penetration limiters, a two-tiered design, and a better chamfer—would not be capable of preventing the complications that Ms. Banks experienced. Ex. 22, Jan. 30, 2019 Deposition of Robert M. McMeeking, Ph.D. ("Jan. 30, 2019 McMeeking Dep.") 57:2–21; Ex. 20, July 6, 2017 McMeeking Dep. 150:4–9 (Q: "Do you know of modifications to the Bard filters, any of them, that would have made them unable to fracture, tilt, perforate, or migrate?" A: "I haven't studied that.").

   **RESPONSE: Disputed. The statement misrepresents Dr. McMeeking's opinion in context. While a filter may, for example, migrate due to "improper deployment," G2 Instructions for Use, Doc. 100-1, p. 1, which Dr. McMeeking's proposed design changes would not necessarily prevent, his proposed changes would substantially reduce the risk of caudal migration and severe perforation experienced by Ms. Banks, and which Dr. Muehrcke will testify were not caused by any outside factor other than the design issues identified. Doc. 100-14, p. 13. Dr. McMeeking will testify that penetration limiters would have slowed the rate of perforation. Ex. P, McMeeking Report, p. 23. Similarly, caudal anchors resisted migration better than similar filters without this feature. *Id.* at 18, 19.**

   **Moreover, Bard had evidence in 2006 that caudal anchors "prevented" a 30% migration rate in the Greenfield filter. Ex. Q, p. 3. Bard intended to gain clearance for this design change in early 2007, Ex. R, p. 2, but ultimately decided to delay the**

change because it was concerned the FDA had an "understanding that our bench testing was indicative of clinical performance," and if Bard submitted the proposed design change the "FDA will probably question if that belief is still true." Ex. F, p. 2. Ultimately, Bard corrected this issue with the Meridian filter in 2011. Doc. 100-15, p. 14.

Other design changes were related to the SNF filter, and therefore also viable alternatives. Ex. S, McMeeking Report 5/11/17, p. 12 ("The higher stiffness of the petals of the SNF compared to the arms of the Recovery and G2 filters makes the SNF a superior design in regard to resistance to migration."); *id.* at 14 ("additional feature of the SNF that is beneficial . . . is the fact that it has 2 sleeves [thus] . . . the clot trap can tilt without the legs having to tilt very much."); *id.* at 15 ("alternating strains in the petals of the SNF will always be very small, and fatigue fracture is unlikely."); *id.* (non-petal arms of G2 more likely to perforate); *id.* at 16 ("if a petal wire [SNF] experiences a fracture by fatigue, the pieces of the broken wire remain attached to the filter . . . . in contrast to the situation for the Recovery and G2 filters, where a fracture due to fatigue may result in a loose piece of the limb migrating to other areas of a patient's anatomy.").

46.  Although Dr. McMeeking believes that his proposed alternative design would reduce the risk of complications to some unknown extent, he has "done no studies, no testing," and no "analysis as to whether [his] ideas would have the benefit that [he] think[s] they would have" for any particular patient or plaintiff. Ex. 19, McMeeking Hyde Trial Tr. 635:10–13; 637:17–20.

**RESPONSE: Disputed. Dr. McMeeking analyzed the impact of the proposed design changes throughout his report. For example, Dr. McMeeking will testify that penetration limiters would have slowed the rate of perforation. Ex. P, p. 23. Similarly, caudal anchors resisted migration better than similar filters without this feature. *Id.* at 18, 19. Moreover, Bard had evidence in 2006 that caudal anchors "prevented" a 30% migration rate in the Greenfield filter. Ex. Q, p. 3.**

47.    Dr. McMeeking has done no calculations to quantify the likelihood that his proposed alternative design would avoid the risks of complications in a patient. Ex. 22, Jan. 30, 2019 McMeeking Dep. 57:7–11; 115:8–12.

**RESPONSE: Disputed. Dr. McMeeking analyzed various design features of the Simon Nitinol filter and concluded that those designs would reduce the risk of tilt and perforation. McMeeking Rebuttal Report, Ex. S, pp. 14-16.**

48.    Dr. McMeeking has not assessed whether his proposed alternative design would be feasible in terms of delivery or retrieval, done no calculations "as to the effect that a two-tiered design would have on a filter," and offers no specificity, drawings, or other details about his proposed alternative design. Ex. 22, Jan. 30, 2019 McMeeking Dep. 43:19–22; 47:11–14; 58:13–17; 79:7–14; Ex. 19, McMeeking *Hyde* Trial Tr. 635:19–23.

**RESPONSE: Disputed. The proposed design changes are feasible because they were implemented in the Meridian filter (launched in 2011, but capable of being launched in early 2007, Doc. 100-15, p. 14; Ex. R, p. 2; Ex. F, p. 2 ), the Simon Nitinol Filter, which was on the market in 2007, Ex. S, McMeeking Rebuttal Report, pp. 12-16, the Greenfield filter, which implemented caudal anchors in 2006, Ex. Q, p. 3, and the Denali filter. Ex. P, McMeeking Report, pp. 20-25.**

49.    Ms. Banks designated no experts who contend that there was a defect in the manufacturing process or that any such defect caused her alleged injuries. *See generally* Ex. 17, Pl.'s Expert Discl.; Ex. 15, Muehrcke Rep.

   **RESPONSE: Admitted. Plaintiff withdraws her manufacturing defect claim.**

50.    In October 2007, Ms. Banks presented with DVT related to a calf vein thrombosis which caused swelling and pain.

   **RESPONSE: Disputed. Defendants do not cite any evidence in the record for this statement. To the contrary, Dr. Schuber testified that Ms. Banks' clot may have been "superficial" rather than "deep", the normal indication for an IVC filter. Ex. B, Schuber Deposition (June 29, 2021), 51:13-25 ("Q. Would that be considered a DVT? A. Yes. So that's an interesting question. There's a little bit of disagreement, I guess you could say, on that, is what is considered D[eep] ven[o]us thrombosis and what is considered something that's more superficial. And so in her case, she had a clot in the peroneal vein, which is more in the calf. And so that one would have been kind of a clot that would be a little on the fence, so to speak. Where, you know, traditionally a deep venus thrombosis would be considered something, for instance, perhaps in the superficial femoral vein or common femoral vein or even popliteal vein.").**

51.    Normally, DVT is managed with anticoagulation, but Ms. Banks was a poor candidate for anticoagulation due to a low platelet count associated with an autoimmune disease called ITP (idiopathic thrombocytopenia purpura). Ex. 23, Select redacted medical records of Theda D. Banks, at BANKST_OLLRMC_MDR01033 (identifying ITP as one of Ms. Banks's medical conditions on October 28, 2007; Ex. 24, Rule 26 Expert Report of Moni Stein, M.D., FSIR ("Stein Rep.") p. 24.

**RESPONSE: Qualified. As noted above, Plaintiff the evidence is equivocal as to whether she had DVT.**

52.    A filter was placed in Ms. Banks to address the possibility of propagation of the clot to larger veins and possible PE. Ex. 11, June 29, 2021 Schuber Dep. 51:5–53:13; Ex. 23, Select redacted medical records of Theda D. Banks, at BANKST OLLRMC MDR00984–985; Ex. 24, Stein Rep. p. 24.

**RESPONSE: Admitted.**

53.    Dr. Schuber's implant note states that the G2 filter is "a removable filter" and instructed to "contact the interventional radiology department . . . if subsequent filter retrieval is warranted." Ex. 23, Select redacted medical records of Theda D. Banks, at BANKST OLLRMC MDR00984–985.

**RESPONSE: Qualified. Dr. Muehrcke opined that "Bard did not instruct physicians to remove the filters after they were no longer needed to reduce the risk to patients in the case of retrievable filters" and "Bard failed to provide implanting physicians' information they needed to be as an informed intermediary. Doc. 110-14, Muehrcke Rep. p. 21. Moreover, in 2007, the filter was indicated for permanent placement only. Doc. 97-24 ¶ 6.**

54.    Ms. Banks's filter remained in place with no known complications until March 2016, when a CT scan showed that her filter had tilted and that multiple struts perforated the IVC wall. Ex. 24, Stein Rep. pp. 24–26.

**RESPONSE: Disputed. Dr. Stein opined that imaging in 2011 indicated that the filter "was moderately tilted and there was some deformity of a strut but no obvious fracture." Plaintiff does not dispute that this was unknown in 2011. Doc. 100-23, pp. 19, 24.**

Plaintiff's Responses to Defendant's Statement of Material Facts                    28

55.    Dr. Schuber testified that his practice is "not set up . . . to follow patients long term," so they rely "on the physicians who ordered the filter and are following these patients over a period of time to provide the filter follow-up." Ex. 12, Dec. 16, 2021 Schuber Dep.94:14–95:19.

> **RESPONSE: Qualified. The quotation is accurate, but in 2007, the filter was indicated for permanent placement only. Doc. 97-24 ¶ 6.**

56.    Dr. Schuber testified that he and the doctors in his practice operate "in a manner that we feel fit," so he could not say how they would have proceeded if Bard had advised them that "it would be a good idea, in the interest of patient safety, to monitor the patient on a periodic basis to see if the devices was moving or not performing in a manner in which [he] expected or anticipated so that steps could be taken to prevent further injury or harm to the patient." Ex. 12, Dec. 16, 2021 Schuber Dep. 33:10–34:4.

> **RESPONSE: Qualified. Plaintiff does not dispute the accuracy of the quotation. The statement is misleading by omission, however. Dr. Schuber testified that he believed that the G2 filter was the best filter on the market at that time; and that had he been made aware of evidence that it had higher failure rates, he would have had reservations about using it. Ex. D, Schuber Affidavit, Aug. 10, 2022, ¶ 10 ("In 2007 I believed, based in part on representations made by Bard, that the G2 filter was the best available filter at that time. I further understood that it rarely fractured, perforated, migrated, or tilted after implantation."); *id.* at ¶ 19 ("Nothing that I recall receiving or reading in the filter instructions during my training or fellowship regarding the IVC filters indicated that the G2 filter had design issues that increased the risk of the type of complications experienced by Ms. Banks"); Ex. B, Schuber Deposition, June 29, 2021, 16:23-25 ("it was extremely common for the device sales reps to come in and have actual kind of demonstrations."); Ex. D, Schuber Affidavit,**

**Aug. 10, 2022, ¶ 20 ("Had I been advised of the problems with the IVC filter device from a patient-safety standpoint, I would have had reservations with using the G2 filter on my patients, including Ms. Banks and most assuredly would have advised her of this as part of the informed consent process and left the decision to her with her to have the G2 implanted in her or not."); Ex. C, Schuber Deposition, December 12, 2021 at 94:1-3 ("if given the choice of using a G2 or some other filter, I would probably use a different filter, with what we know now.").**

**Moreover, after he placed Ms. Banks' filter, he had a conversation with a Bard representative about "significant performance issues related to the design of the G2 device that was increasing the risk of using that device in patients". Ex. B, Schuber Deposition, June 29, 2021, 56:8-58:12; *id.* at 60:20-61:5 ("I recall having conversations, or a conversation with the rep, with the acknowledgment that there may be a problem and that they were doing their due diligence to look into it.").**

**Dr. Schuber was generally not aware of problems with the G2 filter. *Id.* at 30:21-31:4, 33:6-8 ("Q. Was there anything about the G2 and its history . . . where the company had recognized that it had a higher risk and a higher potential to migrate, tilt, and perforate? . . . A. That's not information I had, no. . . . So again, at the time, I was not aware of any additional risks specific to the G2 filter.").**

57.     Schuber testified that he does not base his clinical decisions on internal documentation of a medical device company. Ex. 12, Dec. 16, 2021 Schuber Dep. 71:24–72:4.

**RESPONSE: Disputed. Dr. Schuber testified, "if any device manufacturer came to me with that information, yeah I would have reservations about using any device in that circumstance." Dec. 16, 2021 Schuber Dep. 10:20-23; Ex. D, Schuber Affidavit, Aug. 10, 2022, ¶ 20 ("Had I been advised of the problems with the IVC filter device from a patient-safety standpoint, I would have had reservations with using the G2 filter on my patients, including Ms. Banks and most assuredly would have advised her of this as part of the informed consent process and left the decision to her with her to have the G2 implanted in her or not."); Ex. C, Schuber Deposition, December 12, 2021 at 94:1-3 ("if given the choice of using a G2 or some other filter, I would probably use a different filter, with what we know now.")..**

58.    Dr. Schuber stated that it is possible Ms. Banks's filter saved her life while it was implanted. Ex. 12, Dec. 16, 2021 Schuber Dep. 82:22–83:14.

**RESPONSE: Admitted.**

59.    Dr. McMeeking has acknowledged that a permanent filter is "not meant to be used" in situations like this one, "where retrieveability is -- is advised by the doctor." Ex. 20, July 6, 2017 McMeeking Dep. 222:1–20.

**RESPONSE: Qualified. In 2007, the filter was indicated for permanent placement only. Doc. 97-24 ¶ 6.**

60.    Dr. McMeeking has not analyzed what modifications might be needed to make a permanent filter percutaneously retrievable while still maintaining its efficacy. Ex. 20, July 6, 2017 McMeeking Dep. 206:1–10.

**RESPONSE: Qualified. Dr. McMeeking did not address this precise point. However, the G2 filter, in 2007, was indicated for permanent placement only. Doc.. 97-24 ¶ 6. Moreover, Dr. Morris, an expert Bard hired in other IVC filter lawsuits, conceded**

**that the SNF filter could be removed percutaneously, the purported advantage of the G2. Ex. T, Morris Deposition, at 212:1-213:9 ("Q. . . . there are doctors who have removed SNF filters percutaneously? A. Yeah, . . . there's a series, a small series . . . They're not designed to be retrieved percutaneously, although it can be done, yes."). Second, as the MDL court recognized, where, as here, the filter at issue was also designed for permanent placement, [Doc. 97-24, p. 2 ¶ 6], "Whether the retrievability of the Recovery makes it sufficiently unlike the SNF and other permanent filters to disqualify them as reasonable alternative designs is a question for the jury to decide." Ex. U, Tinlin Order, p. 13. Although the Tinlin order related to the Recovery filter rather than the G2 filter, Dr. McMeeking's opinions about the defective design of these filters, and safer alternative options applies equally to the G2 filter, which, on this point, are not materially different.**

61.    Dr. McMeeking admits that he knows of no modifications to the G2 filter or any other Bard filter that would have made them unable to fracture, tilt, perforate, or migrate. Ex. 20, July 6, 2017 McMeeking Dep. 150:4–9; Ex. 18, McMeeking Jones Trial Tr. at 444:15–445:7.

> **RESPONSE: Disputed. The statement misrepresents Dr. McMeeking's opinion in context. While a filter may, for example, migrate due to "improper deployment," G2 Instructions for Use, Doc. 100-1, p. 1, and, therefore, Dr. McMeeking's proposed design changes may not render the filter "unable" to migrate, his proposed changes would substantially reduce the risk of caudal migration and severe perforation experienced by Ms. Banks, and which Dr. Muehrcke will testify were not caused by any outside factor other than the design issues identified. Doc. 100-14, p. 13. Dr. McMeeking will testify that penetration limiters would have slowed the rate of perforation. Ex. P, McMeeking Report, p. 23. Similarly, caudal**

anchors resisted migration better than similar filters without this feature. *Id.* at 18,
19. Moreover, Bard had evidence in 2006 that caudal anchors "prevented" a 30%
migration rate in the Greenfield filter. Ex. Q, p. 3. Bard intended to gain clearance
for this design change in early 2007, Ex. R, p. 2, but ultimately decided to delay the
change because it was concerned the FDA had an "understanding that our bench
testing was indicative of clinical performance," and if Bard submitted the proposed
design change the "FDA will probably question if that belief is still true." Ex. F, p.
2. Ultimately, Bard corrected this issue with the Meridian filter in 2011. Doc. 100-
15, p. 14. *See also* Ex. S, McMeeking Report 5/11/17, p. 12 ("The higher stiffness of
the petals of the SNF compared to the arms of the Recovery and G2 filters makes
the SNF a superior design in regard to resistance to migration."); *id.* at 14
("additional feature of the SNF that is beneficial . . . is the fact that it has 2 sleeves
[thus] . . . the clot trap can tilt without the legs having to tilt very much."); *id.* at 15
("alternating strains in the petals of the SNF will always be very small, and fatigue
fracture is unlikely."); *id.* (non-petal arms of G2 more likely to perforate); *id.* at 16
("if a petal wire [SNF] experiences a fracture by fatigue, the pieces of the broken
wire remain attached to the filter . . . . in contrast to the situation for the Recovery
and G2 filters, where a fracture due to fatigue may result in a loose piece of the
limb migrating to other areas of a patient's anatomy.").

62. There is no evidence that Ms. Banks experienced a PE during the time she had her G2 filter
implanted. Ex. 24, Stein Rep. pp. 24–26.

> **RESPONSE: Disputed.** Dr. Morris, whom Bard hired in another IVC filter case,
> testified that most pulmonary embolisms are asymptomatic, and people possibly
> have pulmonary embolisms without knowing it. Ex. T, Morris Deposition, 201:11-

**16. Plaintiff also disputes the implication that there is any evidence that the G2 filter provided any benefit to Ms. Banks.**

**II.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff submits the following statement of facts in opposition to Defendants' motion for summary judgment:

1.    Ms. Banks' filter failed by severely tilting, migrating downward and perforating into her pancreas and aorta, causing right upper quadrant pain, and flank pain, and requiring open surgery to remove. Doc. 100-14, p. 12.

2.    The Instructions for Use associated with the G2 filter do not warn about tilt. Doc. 100-1.

3.    The Instructions for Use associated with the G2 filter do not warn about the cascade of failures that occurred here: tilt and downward migration leading to perforation of her pancreas and aorta, causing pain. Doc. 100-1.

4.    The Instructions for Use associated with the G2 filter do not warn that the cascade of failures that occurred here would require open surgery. Doc. 100-1.

5.    The Instructions for Use associated with the G2 filter warn about "medical intervention," and "death," but indicate that this occurs "with the use of vena cava filters in morbidly obese patients." Doc. 100-1, p. 1.

6.    The Instructions for Use associated with the G2 filter tell doctors to weigh the "risk/benefit" ratio of the potential, implying that Bard has provided complete information about the risks of the filter (e.g., frequency and severity) and the benefits (e.g., ability to prevent a pulmonary embolism, and whether benefits are reduced, for example, by tilt). Doc. 100-1, p. 1.

7.    A tilted G2 filter has a compromised clot-trapping ability. Doc. 100-14, p. 12.

8.    Ms. Banks received open surgery to remove the G2 filter from her body after it damaged her pancreas and aorta and caused severe pain, and bleeding. She has continuing abdominal pain from the surgery. Ex. V, ¶¶ 7, 8; Doc. 100-14, pp. 2, 12.

9.    Parts of the G2 filter could not be removed and remain in her body. *Id.* ¶ 8.

10.    Because of the damage caused by the G2 filter, Ms. Banks required the implantation of additional medical devices. Doc. 100-14, p. 2.

11.    Ms. Banks was involved in the decision to have a G2 filter inserted into her body; she relied on information provided by Dr. Schuber in deciding to accept the procedures. *Id.* ¶¶ 10-11.

12.    Dr. Schuber did not tell her that the G2 filter had higher frequency of failures, or was causing more severe injuries than other available options, or had design issues that caused an unacceptable risk, had she been told that, she would not have accepted the G2 filter. *Id.* ¶¶ 12-17.

13.    Ms. Banks continues to have anxiety that the pieces of the filter that remain in her body will cause more injury, or death. *Id.* ¶ 18.

14.    Bard determined that caudal migration was an "unacceptable" risk. Doc. 100-14, pp. 17-18.

15.    Bard knew that comparatively, the SNF was a significantly safer device than the G2 filter. In December 2005, Dr. Ciavarella, Bard's Corporate Clinical Affairs Director, noted the complications with the G2 filter and stated: "The G2 is a permanent filter; we also have one (the SNF) that has virtually no complaints associated with it. 'Why shouldn't doctors be using that one rather than the G2?'" *Id.* at 18.

16.    By February 2006, Bard determined the G2 filter suffered instability problems and was migrating caudally and a "high percentage of caudal migrations (were) accompanied by significant

filter tilting and limb displacement." Bard concluded the severity of these occurrences was "critical." *Id.* at 17.

17.    Dr. Schwartzberg followed patients for six months. Exhibit W, Schwartzberg Deposition, 36:8-20.

18.    Bard had not advised Dr. Schwartzberg, however, that the G2 filter should be monitored for migration, perforation, or tilt. *Id.* at 36:25-37:10.

19.    The G2 Brochure claims that the G2 filter is "Self-Centering," and takes "strength and stability to a new level." Exhibit X, pp. 2, 3.

20.    The G2 Brochure further claims that it "combines the **best design features** of Bard's existing vena cava filters," implying that it has design features from the SNF filter. Exhibit X, p. 2.

21.    Bard provided a "Patient Questions and Answers" pamphlet to doctors to either provide to patients or discuss with them. Exhibit Y, 67:17-68:11. The pamphlet indicated no risks and explained to patients that "The G2 filter vena cava filter is designed to be a permanent implant and does not need to be removed, repositioned, or replaced." Exhibit Z, p. 4.

22.    Bard's head of marketing, Janet Hudnall, testified that a manufacturer has a "responsibility to give" doctors "the information required" to assess the risks and benefits of a medical device. Exhibit AA, Hudnall Dep., 53:12-20. She also agreed that doctors "would like to know about the relative risks and the severity and frequency of risks to determine whether or not to use" a device. *Id.* at 56:24-57:7.

23.    Bard's president, John McDermott, testified that "the companies with the devices certainly have an obligation to provide all the relevant information for the doctors to make their product choices." Exhibit BB, McDermott Dep., 229:5-8.

Respectfully submitted,

**Quintairos, Prieto, Wood & Boyer, P.A.**

*/s/ Pamela W. Carter*                                    **_____**

**PAMELA W. CARTER  (BAR NO. 24048)**
**LINDA GONZALES (BAR NO. 35149)**
**9217 Jefferson Highway**
New Orleans, Louisiana   70123
Telephone: (504) 527-5055
Facsimile: (504) 527-5056
Email: pamela.carter@pwblaw.com
Email: linda.gonzales@qpwblaw.com
**Counsel for the Plaintiff, Theda Banks**

And

**LOPEZ MCHUGH LLP**
**RAMON LOPEZ (CA BAR NO. 86361)**
*PRO HAC VICE*
120 Vantis Drive, Ste. 430
Aliso Viejo, CA  92656
Telephone:  (949) 737-1501 -
Facsimile:  (949) 737-1504
RLopez@lopezmchugh.com
**JOSHUA M. MANKOFF (PA BAR NO. 210242)**
*PRO HAC VICE*
One International Plaza, #550, PMB-059
Philadelphia, PA
Telephone:  (215) 952-6910
 Facsimile:  (215) 952-6914
jmankoff@lopezmchugh.com
**Counsel for the Plaintiff, Theda Bank**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of this document filed electronically with the Clerk of the Court using the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

              _/s/ Pamela W. Carter_____

              **PAMELA W. CARTER**