UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THEDA BANKS

VERSUS

C.R. BARD, INC. AND
BARD PERIPHERAL VASCULAR, INC.

CIVIL ACTION

17-193-SDD-RLB

### RULING

Before the Court is the *Motion for Summary Judgment*[1] filed by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Defendants"). An *Opposition*[2] was filed by Plaintiff Theda Banks ("Banks"), to which Defendants filed a *Reply*.[3] For the following reasons, the *Motion* is granted in part and denied in part.

### I.   BACKGROUND

This is a products liability action that was remanded to this Court for a plaintiff-specific trial from the multidistrict litigation captioned *In re: Bard IVC Filters Products Liability Litigation*, MDL 2641, in the United States District Court for the District of Arizona (the "MDL"). Voluminous and comprehensive fact and expert discovery was undertaken in the MDL and no further general fact or expert discovery shall be pursued.

Banks brings this action for personal injuries suffered after being implanted with a medical device manufactured by Defendants. The device, an Inferior Vena Cava ("IVC") filter, is intended to filter or "catch" blood clots that travel from the lower portions of the body to the heart and lungs.[4] Banks's filter—the G2 filter—is conical in shape and consists of a main shaft with twelve struts (six "arms" and six "legs") that extend to the wall of the

---

[1] Rec. Doc. 97.
[2] Rec. Doc. 105.
[3] Rec. Doc. 117.
[4] Rec. Doc. 100-1, p. 2.

IVC.[5]

In October 2007, Banks experienced blood clotting in her legs that caused swelling and pain.[6] On October 29, 2007, Dr. Scott B. Schuber implanted the G2 filter in Banks.[7] At that time, he believed that the G2 filter "had a similar risk to other filters on the market."[8]

The G2 filter came with an "Instructions for Use" document ("IFU") that warned of potential complications associated with the filter.[9] According to the IFU:

> Movement or migration of the filter is a known complication of vena cava filters. This may be caused by placement in IVCs with diameters exceeding the appropriate labeled dimensions specified in the IFU. Migration of filters to the heart or lungs have been reported in association with improper deployment, deployment into clots and/or dislodgment due to large clot burdens.[10]

The IFU also warned of "[p]erforation or other acute or chronic damage of the IVC wall."[11] When asked at his deposition if he had ever reviewed the IFU, Dr. Schuber stated "I don't believe I have, no."[12] Bard's sales representatives also visited Dr. Schuber twice per month and told him, among other things, that the G2 filter was less likely to tilt than the Simon Nitinol filter ("SNF"), a permanent-only filter manufactured by Bard.[13]

Banks's filter remained in place without known complication until March 2016, when it failed by severely tilting, migrating downward, and perforating her IVC wall, as well as her pancreas and aorta.[14] This failure resulted in open surgery and the

---

[5] *Id.*
[6] Rec. Doc. 100-10, p. 6 (Dr. Schuber deposition) ("she had a clot in the peroneal vein, which is more in the calf").
[7] Stipulated to by parties. Rec. Doc. 106, p. 6.
[8] Rec. Doc. 113-5, p. 5.
[9] Rec. Doc. 100-1, p. 2.
[10] *Id.*
[11] *Id.*
[12] Rec. Doc. 100-10, p. 25.
[13] Rec. Doc. 113-29, p. 11.
[14] Rec. Doc. 95-6, p. 12. Defendants suggest that there is no CT scan or imaging showing that Banks's filter migrated. However, for purposes of summary judgment only, Defendants accept as true Dr. Muehrcke's opinion that migration occurred. Rec. Doc. 97-1, p. 7 n.1.

implantation of additional medical devices to repair the damage caused. Parts of the filter could not be removed and were left in her body.[15]

After this case was remanded from the Arizona MDL, Banks filed an *Amended Complaint* asserting five causes of action against Defendants for construction or composition defect (Count I), design defect (Count II), inadequate warning (Count III), breach of express warranty (Count IV), and redhibition (Count V).[16] Through the instant *Motion*, Defendants seek summary judgment on all counts.

**II.    LAW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[18]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[19]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[20]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a

---

[15] *Id.*
[16] Rec. Doc. 36.
[17] Fed. R. Civ. P. 56(a).
[18] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[19] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[20] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

scintilla of evidence."[21]

"A genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[22] All reasonable factual inferences are drawn in favor of the nonmoving party.[23] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[24] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint."[25]

### III.  ANALYSIS

The Louisiana Products Liability Act ("LPLA") establishes the exclusive theories of liability that can be brought against a manufacturer for damage caused by its products.[26] To prevail under any theory under the LPLA, a plaintiff must establish four elements: (1) defendant manufactured the product at issue; (2) plaintiff's injury was proximately caused by a characteristic of the product; (3) this characteristic made the product unreasonably dangerous; and (4) plaintiff's injury arose from a reasonably anticipated use of the product by plaintiff or someone else.[27] The LPLA specifies four instances when a product is

---

[21] *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[22] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[23] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[24] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[25] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(citation omitted)(internal quotation marks omitted)(cleaned up).
[26] La. Stat. Ann. § 2800.52 (2020).
[27] *Stewart v. Capital Safety USA*, 867 F.3d 517, 520 (5th Cir. 2017) (citing *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 260-61 (5th Cir. 2002)).

"unreasonably dangerous": (1) in construction or composition, (2) in design, (3) when the manufacturer has not provided an adequate warning about the product, and (4) when the product does not conform to an express warranty of the manufacturer about the product.[28] Banks has withdrawn her claims for construction defect and redhibition. She now asserts only three claims based on (1) design defect, (2) failure to warn, and (3) breach of an express warranty.[29] The Court will address these in turn.

### A. Design Defect

To survive summary judgment on a claim of defective design, a plaintiff must present competent evidence that would enable a trier of fact to conclude at the time the product left the manufacturer's control that 1) there existed an alternative design for the product that was capable of preventing the claimant's damage, and 2) the likelihood of preventing such damage outweighed the burden on the manufacturer of adopting the alternative design and the adverse effect, if any, of the alternative design on the utility of the product.[30] The second element is commonly referred to as the "risk-utility balancing test."[31]

Defendants argue that summary judgment is appropriate because Banks cannot offer an alternative design that would have prevented her injuries. Dr. Robert M. McMeeking, who Banks lists as a general liability expert, proposes two alternative designs: (1) Bard's SNF and other permanent-only filters, and (2) his own hypothetical design changes to the G2 filter.[32] Defendants contend that neither of those alternatives

---

[28] La. Stat. Ann. §§ 2800.54, 2800.55, 2800.56, 2800.57, 2800.58.
[29] Rec. Doc. 105, pp. 2-3.
[30] *Couturier v. Bard Peripheral Vascular, Inc.*, 548 F.Supp.3d 596, 607 (E.D. La. July 9, 2021) (citing *Ashley v. GMC*, 666 So. 2d 1320, 1320 (La. Ct. App. 1996)).
[31] *See, e.g., Perez v. Brown Mfg.,* No. 98–478, 1999 WL 527734, at *4 (E.D.La. July 21, 1999).
[32] Rec. Doc. 106, pp. 23-4.

would have completely eliminated the risk of the complications that Banks experienced. First, medical literature shows that permanent-only filters like the SNF migrated up to 18% of the time and perforated the ICV up to 41% of the time.[33] Second, Dr. McMeeking has admitted that his hypothetical design changes "would not have eliminated" the possibility of migration, tilt, fracture, and penetration.[34]

Banks argues that it is factually disputable whether a safer alternative design was available and whether that design could have prevented her injuries. Banks points out that, under Louisiana law, a plaintiff does not have to show that a proposed alternative design would completely eliminate the possibility of failure; rather, the plaintiff must show that "the alternative design would have been significantly less likely" to fail.[35]

Banks is correct on the law. According to Louisiana jurisprudence, "'capable' does not mean that the alternative design definitely or completely would have prevented the damage. It does mean, however, that the alternative design would have been significantly less likely than the chosen design to cause the damage for which the claimant has filed suit or that the alternative design would have significantly reduced such damage."[36] The Court now examines the sufficiency of the evidence with respect to each alternative design.

1. The SNF

There is evidence suggesting that the SNF, which was available when Banks received her implant,[37] would have been significantly less likely than the G2 filter to result

---

[33] Rec. Doc. 100-2.
[34] Rec. Doc. 100-21, pp. 6-7.
[35] *See Johnson v. Black & Decker, U.S., Inc.*, 701 So,2d 1360, 1362 (La. App. 2d 1997).
[36] *Wilson v. Hovart Corp.*, 1996 WL 117502, at *3 (E.D. La. Mar. 15, 1996) (quoting Kennedy, *A Primer on Louisiana Products Liability Act,* Vol. 49 La. L. Rev. 565, 596 (1989)).
[37] Rec. Doc. 100-14, p. 18.

in tilt, migration, and perforation. In his general expert report, Dr. McMeeking opines that the design of the SNF is substantially better than [the G2 filter] with respect to migration, tilt, arm fracture and arm perforation" and the SNF "is much less likely to experience migration" than the G2 filter.[38] After pointing out beneficial features unique to the SNF (e.g., higher stiffness of petals, two sleeves, alternating strains), he concludes that "the SNF is substantially less likely to result in complications once implanted as compared to the Bard Recovery and later generation Bard filters."[39] Accordingly, a genuine factual dispute exists as to whether the SNF design was capable of preventing—or would have been significantly less likely to cause—Banks's injuries.

Defendants further argue that the second element of the design-defect claim, the risk-utility balancing test, requires summary judgment because permanent-only filters like the SNF "are fundamentally different products from retrievable filters like the G2 filter."[40] Defendants contend that "removing the utility of retrievability from a retrievable IVC filter would have such an enormous effect on the utility of the medical device that it could not be outweighed by any countervailing factors."[41]

This argument is unpersuasive for two reasons. First, the usefulness of retrievability is hardly self-evident as the evidence does not suggest that "retrievability" contributes to the efficacy or life-saving capability of the filter in any way. Rather, evidence suggests that retrieval is optional and performed after the device is no longer needed.[42] A reasonable juror could find that elective retrieval does not warrant a significantly

---

[38] Rec. Doc. 113-23, pp. 13, 16.
[39] *Id.*, p. 8.
[40] Rec. Doc. 97-1, p. 13.
[41] Rec. Doc. 117, p. 9.
[42] *See* Rec. Doc. 100-14, p. 22.

heightened risk profile. Second, it is factually disputable whether the G2 filter actually possessed retrieval capabilities at the time Banks underwent implantation. The IFU then in use stated that "the G2 Filter is designed to act as a permanent filter" and "the safety and effectiveness of the G2 Filter System for use as a retrievable or temporary filter have not been established."[43] Indeed, in its marketing material, Bard stated that "[t]he G2 filter is designed to be a permanent implant and does not need to be removed, repositioned, or replaced."[44] Given these factual uncertainties, a jury should be allowed to weigh the risks and benefits of the G2 filter.

2. Hypothetical Design Changes

Banks advances another alternative design in the form of hypothetical design changes proposed by Dr. McMeeking. In his general expert report, Dr. McMeeking contends that Bard could have changed the G2 filter's design by adding caudal anchors, penetration limiters, two-tiered design, and a better (smoother and rounded) chamfer at the mouth of the "cap" on its filters. He suggests that penetration limiters would have slowed the rate of perforation and that caudal anchors would have resisted migration better than in filters without this feature.[45]

Problematically, however, Dr. McMeeking never asserts that his proposed changes would *significantly* reduce the likelihood of tilt, migration, and perforation—only

---

[43] Rec. Doc. 100-1, p. 2.
[44] Rec. Doc. 113-30, p. 5.
[45] Rec. Doc. 105, p. 10 (citing Rec. Doc. 113-20, p. 20, 24). Banks also points to an internal corporate document as indicating, in her words, that "caudal anchors 'prevented' a 30% migration rate in the Greenfield filter." Rec. Doc. 105, p. 10 (citing Rec. Doc. 113-21, p. 4). According to the document, "[a] 30% instance of caudal migration was found during the Greenfield clinical trial" and "[a]s a result, the filter was redesigned by flipping 2 hooks to prevent caudal migration." Rec. Doc. 113-21, p. 4. However, the report does not indicate whether the causal anchors were in fact successful at preventing or reducing the 30% instance rate.

that his changes would reduce the risk of those complications to some unknown extent.[46] When questioned about the efficacy of those changes, Dr. McMeeking denied performing "any testing or any calculations to quantify the extent to which those design attributes would reduce the risk of complications in a patient."[47] Thus, Banks presents no competent summary judgment evidence that Dr. McMeeking's hypothetical design changes could have prevented her injuries. Summary judgment as to that specific alternative design is appropriate and is hereby granted. Whether the SNF could have prevented Banks's injuries is a question for the jury.[48]

Last, Defendants challenge Banks's design defect claim with respect to causation. Defendants contend that even if an alternative design could have prevented her injuries and satisfied the balancing test, Banks cannot show that her filter's defective design was the proximate cause of her injuries.[49] A "proximate cause" is generally defined as "any cause which, in natural and continuous sequence, unbroken by an efficient, intervening cause, produces the result complained of without which the result would not have occurred."[50] If there is more than one cause of injury, a defendant's conduct is a cause-in-fact, or proximate cause, if it is a substantial factor generating the plaintiff's harm.[51]

Here, however, defendants do not attempt to argue that an intervening cause produced or contributed to Banks's injuries. For example, Defendants do not argue that

---

[46] *See* Rec. Doc. 113-20.
[47] Rec. Doc. 100-21, p. 9.
[48] The Court is aware that some of the features in Dr. McMeeking's hypothetical design filter also appeared in the SNF and other Bard filters. At trial, Banks is not prevented from arguing that those design elements resulted in the SNF having a significantly lower complication rate than that of the G2 filter. However, for the reasons discussed herein, Banks has presented insufficient evidence to warrant a jury finding as to whether a purely hypothetical filter design would have prevented her injuries.
[49] *George v. Housing Authority of New Orleans*, 04-2167, p. 6 (La. App. 4 Cir. 6/29/05), 906 So.2d 1282, 1286.
[50] *Sutton v. Duplessis*, 584 So.2d 362, 365 (La. App. 4 Cir. 1991).
[51] *Rando v. Anco Insulations Inc.,* 08–1163, 08–1169, p. 30 (La. 5/22/09), 16 So.3d 1065, 1088.

the filter was improperly implanted or that an external event caused the filter to malfunction. Banks's case-specific expert, Dr. Derek Meuhrcke, could not identify any external forces that would have caused the filter to fail as it did.[52] In challenging causation, Defendants simply repeat their earlier argument that complications such as tilt, migration, and perforation are universal to all IVC filters. But this argument risks running in circles. Banks has presented sufficient evidence at this stage to show that her filter's design was defective insofar as an alternative design (the SNF and its distinct features) could have prevented her injuries. Dr. McMeeking's report shows that the SNF would have been significantly less likely to result in tilt, migration, and perforation,[53] and competent evidence shows that Banks's filter failed by tilting, migrating, and perforating her IVC wall.[54] A reasonable jury could find that the G2 filter's defective design—its failure to use design features present in the SNF—was the proximate cause of Banks's injuries.

### B. Failure to Warn

In her second claim, Banks contends that the G2 filter was unreasonably dangerous because Bard failed to disclose that the G2 had higher rates of tilt, migration, and perforation than other filters on the market.

A product is unreasonably dangerous if, at the time it left the manufacturer's control, it possessed a characteristic that could cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.[55] A manufacturer has a continuing statutory duty to warn of any danger inherent in the normal use of its product which is not

---

[52] Rec. Doc. 100-14, p. 25.
[53] Rec. Doc. 113-23, pp. 13, 16.
[54] Rec. Doc. 95-6, p. 12.
[55] La. Stat. Ann. § 2800.57.

within the knowledge of an ordinary user.[56]

Under the "learned intermediary doctrine," which applies to medical device cases like his one, the doctor acts as an informed intermediary between the manufacturer and the patient, and thus, a manufacturer has a duty to warn the prescribing doctor, rather than the patient, of potential risks associated with the product.[57] To recover under this doctrine, a plaintiff must show (1) that the defendant failed to warn the physician of a risk associated with the use of product, not otherwise known to the physician, and (2) that the failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.[58]

Defendants argue that summary judgment is appropriate because the IFU that came with the G2 filter provided an adequate warning to Banks as a matter of law. Defendants point out that the IFU warned of everything that came to pass with Banks's filter, including migration and perforation. Defendants also contend that Dr. Schuber had independent knowledge of the risks associated with the G2 filter, including the complications that Banks experienced.

Banks argues that, although the IFU may have warned about the possibility of migration and perforation, it did not warn Dr. Schuber that the G2 filter had *higher rates* of those complications than other filters made by Bard and its competitors. Dr. Schuber testified that, had he known about the "disproportionate" risks associated with the G2 filter, he would not have used it in Banks.[59]

---

[56] *American Cent. Ins. Co. v. Terex Crane*, 2003-0279 (La. App. 1 Cir. 11/7/03) 861 So.2d 228, 231.
[57] *Brown v. Glaxo, Inc.*, 1999-1531 (La. App. 1 Cir. 11/15/00) 790 So.2d 35, 38-39, *writs denied*, 2000-3457, 2001-0035 (La.2/9/01), 785 So.2d 827, 832.
[58] *Willett v. Baxter Intern., Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991).
[59] Rec. Doc. 113-6, p. 4.

The Court has found no case in Louisiana jurisprudence which mandates disclosure of comparative risk information or information about the frequency or severity of a given complication, irrespective of the circumstances of individual cases. Instead, "reasonableness" remains the deciding factor: A manufacturer meets its duty to warn only when "it has reasonably informed" the prescribing physician "of the dangers of harm."[60] Even if a warning "contains a clear and unambiguous reference to the adverse reaction suffered by the plaintiff," that does not make the warning adequate as a matter of law.[61] Rather, "[f]or summary judgment of an inadequate warning claim to be appropriate, the plaintiff's prescribing physician must . . . unequivocally testify that the warning was adequate to inform him or her of the risks involved."[62]

Here, no such attestation has been made. The implanting physician, Dr. Schuber, stated that he did not recall receiving instructions which indicated that the G2 filter had a higher risk of migration, fracture, perforation, and tilting than other IVC filters and "[h]ad [he] known of disproportionate patient safety concerns relating to the design and function of the G2 filter . . . [he] probably would not have used the G2 filter in Ms. Banks."[63] He added: "It goes without saying we would always want to know or identify if there was a specific product that had a propensity to [fail] more so than others."[64]

Banks also presents an opinion from Dr. Derek Meuhrcke, a board-certified cardiothoracic surgeon, criticizing the IFU and its warnings about risks of the G2 filter.[65] His opinion provides:

---

[60] *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 267 (5th Cir. 2002).
[61] *Id.*
[62] *Id.* at 268.
[63] Rec. Doc. 113-6, p. 4.
[64] Rec. Doc. 113-5, p. 11.
[65] Rec. Doc. 95-6.

> Physicians such as myself would . . . expect that a prudent device manufacturer would not have continued to sell a filter that showed increased rates of caudal migration, tilt, perforation, and fracture . . . Moreover, a prudent manufacturer would warn implanting physicians about its filters' performance. Implanting and referring physicians (customers) were never adequately and appropriately warned of the dangers of the [G2 filter] . . . [i]cluding Ms. Banks's implanting physician Dr. Schuber.[66]

Regarding the IFU, Dr. Meuhrcke acknowledges that "[t]he IFU describes a myriad of possible risks following IVC filter placement, listing every possible risk known to physicians."[67] However, he states that the IFU never provides "clear information on the likelihood of those risks" and concludes that "[t]he Bard G2 IFU was inadequate for physicians' use in medical decision making and the consenting of the patient."[68]

Defendants counter that, per *Kennedy v. St. Charles Gen. Hosp. Auxiliary,* 630 So.2d 888 (La.App. 4 Cir.1993), Louisiana law does not require disclosure of "definite percentages of risk" or the total number of adverse events associated with a given complication. However, Defendants' reliance on *Kennedy* goes too far. First, *Kennedy* is not a product liability case but rather involves an informed consent claim against the plaintiff's treating physician.[69] Second, even if *Kennedy* applies in the LPLA context, *Kennedy* speaks only to "definite percentages of risk" and does not broadly excuse manufacturers from warning of risk probabilities and comparative risk information in a qualitative or more approximate manner.[70] It is one thing to suggest that the risk of a complication is "rare" or "very rare"—instead of, say, "1 in 100" or "1 in 1000"—because, as *Kennedy* acknowledges, "medicine is an inexact science" and "figures undoubtedly

---

[66] *Id.*, p. 21.
[67] *Id.*, p. 23.
[68] *Id.*
[69] *See* 630 So.2d 888, 892 (La. Ct. App. 1993).
[70] *See id.*

vary."[71]  It is another thing to speak only to the possibility of failure, regardless of likelihood, when the rate of failure is unexpectedly high as compared to alternative products. Because Dr. Schuber and Dr. Meuhrcke have indicated that Bard did not reasonably inform them of the dangers of harm, the adequacy of Bard's warnings should be decided by a jury.

Defendants further argue that evidence of an inadequate warning is not enough—Banks "must show that a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate warning, the treating physician" would not have used the product.[72] Defendants argue that Dr. Schuber never read the IFU, per his deposition testimony, and thus it could not have affected his treatment decisions.[73]

However, Louisiana law directs that "the duty to warn, where it exists, is a continuing one."[74] Assuming that a reasonable warning should have included propensity and comparative risk information, Bard had a continuing duty to warn Dr. Schuber about performance issues with the G2 filter, including its alleged proclivity to tilt and migrate relative to other filters.[75] Banks presents evidence that, as early as December 2005, Bard knew that the SNF was less likely to tilt and migrate than the G2 filter. At that time, Bard's Corporate Clinical Affairs Director noted several complications with the G2 filter and stated: "The G2 is a permanent filter; we also have one (the SNF) that has virtually no

---

[71] *See id.* at 892-93.
[72] *Porterfield v. Ethicon, Inc.,* 183 F.3d 464, 468 (5th Cir.1999).
[73] In support of this proposition, Defendants rely on *Pustejovsky v. Pliva*, Inc., 623 F.3d 271, 277 (5th Cir. 2010), in which the prescribing physician did not read the package insert for the drug at issue. However, the facts of that case are distinguishable as the plaintiff failed to show other ways in which an adequate warning might have reached the treating physician and altered her decision. That is not the case here since Bard provided warnings directly to Dr. Schuber through its sales representatives.
[74] *Bunge Corp. v. GATX Corp.*, 557 So.2d 1376, 1384 (1990).
[75] *See Couturier*, 548 F.Supp.3d at 611 ("Because a manufacturer's duty to warn is a continuing one, a genuine issue of material fact exists whether the increased rate of failure of the Eclipse filter rendered defendants' warnings inadequate.").

complaints associated with it. 'Why shouldn't doctors be using that one rather than the G2?'"[76]

The Fifth Circuit has recognized that a physician's failure to read a product's IFU is not "fatal" to an inadequate warning claim where evidence shows that an adequate warning could have reached the physician "by other means."[77] In this case, Bard representatives visited Dr. Schuber in his lab twice per month and it was part of their job to communicate "all of the risks of the G2 and Simon Nitinol filters."[78] A reasonable jury could conclude that Bard had an ongoing opportunity to warn Dr. Schuber about the G2 filter's performance issues and that, had they done so, Dr. Schuber would have refrained from implanting the G2 filter in Banks. Again, Dr. Schuber stated that he probably would not have used the G2 filter had he known about its disproportionate safety concerns."[79] Accordingly, the issue of causation gives rise a genuine factual dispute that should be decided by a jury.

Defendants make a final stand, arguing that a subsequent warning would not have altered Dr. Schuber's treatment decisions. This is because Dr. Schuber testified that his practice is "not set up . . . to follow patients long term," so he relies "on the physicians who ordered the filter and are following these patients over a period of time to provide the filter follow-up."[80] Banks counters that she received follow-ups from another doctor who would have monitored the filter more closely if properly warned of the risks associated with the G2 filter. According to Banks, "[h]ad Bard provided an adequate warning even

---

[76] Rec. Doc. 100-14, p. 18.
[77] *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 777 (5th Cir. 2018).
[78] *See* Rec. Doc. 113-29, p. 11. pp. 5-6, 11.
[79] Rec. Doc. 113-6, p. 4.
[80] Rec. Doc. 97-1, p. 18.

after the filter was implanted, [she] would have received monitoring of her filter, which would have permitted removal before it caused the serious injury that occurred."[81]

Once again, this question is for a jury to decide. Although Dr. Schuber did not typically follow patients' long term, he could have relayed additional warnings to Banks or to the doctor who provided the follow-up, giving them the chance to retrieve the filter or take other preventative action. This line of reasoning also assumes that Bard could not have provided an adequate warning to Banks before her filter was implanted—an assumption that is in tension with the evidence already discussed. A genuine issue of material fact exists as to causation and, thus, summary judgment is inappropriate at this time.

C. **Breach of Express Warranty**

In her third and final claim, Banks contends that Bard made false representations about the G2 filter that induced Dr. Schuber to use it. To survive summary judgment on a breach of express warranty claim under the LPLA, a plaintiff must demonstrate a genuine issue of material fact on whether (1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that express warranty, and (4) the plaintiff's damages were proximately caused because the express warranty was untrue.[82]

Banks points to multiple statements from the G2 sales brochure and Bard's sales representatives as being false or misleading. According to the sales brochure, the G2 filter "combines the best design features of Bard's existing vena cava filters to create a

---

[81] Rec. Doc. 105, p. 18.
[82] *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596 (W.D. La. 2006).

brand-new permanent filter platform—taking strength and stability to a new level."[83] Additionally, one of Bard's sales representatives told Dr. Schuber that the G2 was less likely to tilt than the SNF.[84] Finally, a "Patient Questions and Answers" pamphlet explained to patients that "The G2 vena cava filter is designed to be a permanent implant and does not need to be removed, repositioned, or replaced."[85]

However, there is no evidence that these statements induced Dr. Schuber to use the G2 filter. No evidence shows that Dr. Schuber ever read the G2 brochure or the "Patient Questions and Answers" pamphlet. Likewise, there is no evidence that Dr. Schuber decided to use the G2 filter based on an oral representation from Bard's sales representatives.[86] Although it is within the realm of possibility that Dr. Schuber was induced by one of the aforementioned representations, the non-moving party's burden during the summary judgment phase "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[87] Accordingly, Defendants are entitled to summary judgment on the breach of express warranty claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' *Motion for Summary Judgment*[88] is GRANTED in part and DENIED in part. Banks's claims of construction or composition defect (Count I), breach of express warranty (Count IV), and redhibition (Count V) are DISMISSED WITH PREJUDICE. Her claims of design defect (Count II) and inadequate

---

[83] Rec. Doc. 113-28, p. 3.
[84] Rec. Doc. 113-29, p. 7.
[85] Rec. Doc. 113-30, p. 5.
[86] *See* Rec. Doc. 100-10, p. 9.
[87] *Willis,* 61 F.3d at 315.
[88] Rec. Doc. 97.

warning (Count III) may proceed to a jury.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, this day, December 7, 2022.

*Shelly D. Dick*
_____
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**