**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

THEDA BANKS

CIVIL ACTION

VERSUS

17-193-SDD-RLB

C.R. BARD, INC. AND
BARD PERIPHERAL VASCULAR, INC.

<u>**RULING**</u>

Before the Court is the *Motion in Limine to Exclude Testimony and Evidence of Recovery Filter Migration Deaths*[1] and *Motion in Limine to Exclude Recovery Filter Marketing, Communications, and other Irrelevant and Improper Propensity Evidence*[2] filed by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Defendants"). An *Opposition*[3] was filed by Plaintiff Theda Banks ("Banks"), to which Defendants filed a *Reply*.[4] For the following reasons, the *Motion* is granted.

**I.    BACKGROUND**

This is a products liability action that was remanded to this Court for a Plaintiff-specific trial from the multidistrict litigation captioned *In re: Bard IVC Filters Products Liability Litigation*, MDL 2641, in the United States District Court for the District of Arizona. (the "MDL").[5]

Plaintiff brings this action for personal injuries suffered after being implanted with an Inferior Vena Cava ("IVC") filter medical device manufactured by Defendants. An IVC filter is a device that is designed to filter or "catch" blood clots that travel from the lower

---

[1] Rec. Doc. 129.
[2] Rec. Doc. 136.
[3] Rec. Doc. 149.
[4] Rec. Docs. 167, 168.
[5] *See In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188 (D. Ariz. Jan. 22, 2018).

portions of the body to the heart and lungs. On October 29, 2007, Plaintiff was implanted with a Bard IVC filter known as the G2.[6] Banks's filter remained in place without known complication until March 2016, when it failed by severely tilting, migrating downward, and perforating her IVC wall, as well as her pancreas and aorta.[7]

Before that, in 2002, FDA cleared the Recovery filter, Bard's first-generation retrievable filter, for commercial marketing, which lasted from 2003 to 2005.[8] During this time, Bard received reports of the Recovery experiencing cephalad (upward) migration to a patient's heart resulting in death.[9] Bard issued a Crisis Communication Plan ("CCP") to guide Bard's response to potential media inquiries into the reported Recovery migration deaths.[10] Evidence suggests that the CCP was never used due to a lack of inquiries.[11] Bard also sent sales communiques to its sales force for informational use in responding to questions concerning the deaths.[12] Around this time, a sales representative, Jason Greer, sent an email to a senior marketing manager reflecting on events surrounding the Recovery complications and telling the manager that she held together "a terrible situation . . . with scotch tape, smoke, mirrors, crying, etc."[13]

Bard introduced the G2 (Bard's second-generation retrievable filter) to the market in late 2005.[14] Based on clinical experience with the Recovery, Bard made several significant design changes to the G2 aimed at improving fracture and migration

---

[6] Stipulated to by parties. Rec. Doc. 106, p. 6.
[7] Rec. Doc. 95-6, p. 12.
[8] *Id.*, p. 15.
[9] *Id.*, p. 16.
[10] Rec. Doc. 136-8.
[11] Rec. Doc. 136-7 at 64:4–11.
[12] Rec. Docs. 136-9, 136-10.
[13] Rec. Doc. 136-11.
[14] Rec. Doc. 95-6, p. 11.

resistance.[15] Those changes almost entirely eliminated cephalad migrations.[16]

Bard now moves to exclude evidence of the Recovery migration deaths as well as the CCP, sales communiques, and Greer email that Bard produced in response to those deaths. Bard argues that this evidence is irrelevant and unduly prejudicial because it does not involve the filter or specific complications at issue. Banks responds that this evidence is necessary to establish Bard's awareness of problems with the G2 filter and to fully explain the G2 filter's design history.

## II.    LAW AND ANALYSIS

Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." "Irrelevant evidence is not admissible."[17] Rule 403 provides that relevant evidence may nevertheless be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[18] The Court addresses the relevance and prejudicial effect of each piece of evidence in turn.

A. Evidence of Recovery Migration Deaths

Bard seeks to exclude evidence of cephalad migrations by the Recovery Filter resulting in death. The Fifth Circuit has held that "[w]hen evidence of other accidents or occurrences is offered for any purpose other than to show notice, the proponent of that

---

[15] *Id.*, p. 17.
[16] *In re Bard IVC Filters Prod. Liab. Litig.*, No. CV-16-00782-PHX-DGC, 2018 WL 1993767, at *2 (D. Ariz. Apr. 27, 2018).
[17] Fed. R. Evid. 402.
[18] Fed. R. Evid. 403.

evidence must show that the facts and circumstances of the other accidents or occurrences are 'closely similar' to the facts and circumstances at issue"—otherwise known as "the 'substantial similarity' requirement for admissibility."[19] In the Fifth Circuit, "[t]he question of admissibility of substantially similar accidents is necessarily determined on a case-by-case basis, with consideration to be given to any number of factors, including the product or component part in question, the plaintiff's theory of recovery, the defenses raised by the defendant, and the degree of similarity of the products and of the other accidents."[20]

The circumstances in this case sharply differ from those surrounding the Recovery migrations. For one, this case does not involve a complication resulting in death. Nor does it involve cephalad migration of the entire G2 to the heart. Instead, Banks's own evidence shows that her filter migrated in the opposite direction, "downward" towards her feet. The Court follows the conclusion, reached in two MDL bellwether cases, that "instances of cephalad migration resulting in death are not substantially similar to complications experienced *by the G2* [and subsequent Bard filters]."

Ultimately, the key question in this case is whether Bank's injuries were caused by a design defect in the G2 filter—not the Recovery. There is no evidence, beyond Banks's conclusory allegations, that the Recovery deaths resulted from the same problematic design element that caused Banks's injuries. As the MDL court

---

[19] *Johnson v. Ford Motor Co.*, 988 F.2d 573, 579-580 (5th Cir. 1993); *accord Olivier v. Exxon Mobil Corp.*, No. 18-CV-568-SDD-EWD, 2022 WL 3010691, at *3 (M.D. La. July 29, 2022) (Dick, C.J.).
[20] *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 426 (5th Cir. 2006).

acknowledged, "cephalad migrations largely ceased due to changes made to the G2-line of filters."[21]

Bard points out that in one bellwether trial, the *Booker* trial, the court concluded that evidence of cephalad migrations by a Recovery filter was necessary for the jury to understand the issues that prompted creation and design of the next-generation G2 filter.[22] There, however, the MDL court did not apply the substantial similarity requirement used by courts in the Fifth Circuit. The defendants also opened the door to the Recovery evidence by arguing that the G2 was as safe and effective as the Recovery.[23] Here, it does not appear that Defendants intend to make such an argument at trial.

Moreover, "even when a substantial similarity of circumstances is established, the district court has broad discretion to exclude such evidence under Rule 403 of the Federal Rules of Evidence."[24] The Court finds that the probative value of the Recovery evidence, if any, is substantially outweighed by the risk of prompting an emotional reaction from the jury based on injuries that are more severe than those Banks experienced.[25] Admitting the Recovery evidence also risks confusing the issues and misleading the jury by putting three separate filters on trial. As discussed in this Court's *Summary Judgment Ruling*, Banks must show that an alternative design—the SNF—could have prevented her injuries.[26] Adding evidence of a third filter with different

---

[21] *In re Bard IVC* Filters, 2018 WL 1993767, at *2.
[22] *In re Bard IVC Filters Prod. Liab. Litig.*, No. CV-16-00474-PHX-DGC, 2018 WL 1109554, at *2 (D. Ariz. March 1, 2018).
[23] *Id.*
[24] *Johnson v. Ford Motor Co.,* 988 F.2d 573, 579 (5th Cir.1993).
[25] *See In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 1876896, at **2-3 (D. Ariz. Apr. 18, 2018) ("The fact that several patients died when their Recovery filters migrated in a *cephalad direction* would have an undue tendency to prompt a jury decision based on emotion.").
[26] Rec. Doc. 188, pp. 6-8.

complications would draw attention away from the jury's main task of comparing the G2 and SNF. Accordingly, the evidence of Recovery deaths is inadmissible to support Bank's design defect claim.

Banks also offers the Recovery migration deaths as "notice" evidence to support its inadequate warning claim. When evidence is offered to show notice, the proponent of such evidence must establish "reasonable similarity,"[27] indicated by "similar products failing in a similar manner."[28] Here, the Recovery and G2 filters experienced different complications almost entirely exclusive to each filter. Again, the MDL court acknowledged that "cephalad migrations largely ceased due to changes made to the G2-line of filters" and the rare complication of "cephalad migration deaths stopped after the Recovery."[29] The Court fails to discern how instances of cephalad migration, addressed and corrected by Bard, enabled Bard to predict a different form of migration with a different filter. As the MDL court stated: "[Bard] cannot plausibly claim that the jury should find [Bard] liable to her for failure to warn of deaths that occurred [] years earlier, from a filter she did not receive, and by a means of migration she did not experience."[30] Thus, the Recovery evidence is irrelevant to Banks's warning claim.

Further, the Recovery evidence does not reveal anything about Bard's state of mind that is not already apparent from the evidence. Bard expressly disclosed the possibility of migration in the G2 filter's instructions for use,[31] and Bard now stipulates to having notice of potential migration by the G2 filter.[32] Admitting the Recovery

---

[27] *Johnson*, 988 F.2d at 580.
[28] *Nester v. Textron, Inc.*, 2015 WL 7272249, at *5 (W.D. Tex. Nov. 17, 2015).
[29] *In re Bard IVC Filters*, 2018 WL 1993767, at *2.
[30] *In re Bard IVC Filters Prod. Liab. Litig.*, No. CV-16-00782-PHX-DGC, 2018 WL 2124146, at *2 (D. Ariz. May 8, 2018).
[31] Rec. Doc. 100-1.
[32] Rec. Doc. 129-1, p. 14.

evidence to prove a fact that is already well supported would merely serve to prejudice the jury. Evidence of Recovery migration deaths is inadmissible.

B. Crisis Communication Plan, Sales Communiques, and Greer Email

Next, Bard seeks to exclude evidence of marketing, communications, and other acts relating to the Recovery filter. Specifically, Bard seeks to exclude: 1) a draft of a crisis communication plan ("CCP") related to the alleged Recovery filter migration deaths;[33] 2) sales communiques about Recovery complications, including filter migration;[34] and 3) an email from a sales representative named Jason Greer using the terms "smoke" and "mirrors" when referencing Bard's response to the Recovery filter migration deaths.[35] Bard argues that "[n]othing about these or other Bard marketing, communications, or other prior acts relating to the Recovery speak to whether the G2 was properly designed or accompanied by adequate warnings and warranties."[36]

The Court agrees. This evidence is irrelevant and inadmissible propensity evidence.[37] Bard stopped selling the Recovery after it introduced the G2, so Bard's communications and warnings surrounding the Recovery filter have no bearing on whether Bard, years later, provided adequate warnings for a completely different filter with its own unique design and complications. The CCP and sales communiques are an impermissible attempt to establish a propensity by Bard to downplay complications

---

[33] Rec. Doc. 136-8.
[34] Rec. Docs. 136-9, 136-10.
[35] Rec. Doc. 136-11.
[36] Rec. Doc. 136-1, p. 2.
[37] *See* Fed. R. Evid. 404(b) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

with all of its filters, without actually establishing that the G2 filter, including Banks's, was accompanied by an inadequate warning.[38]

Banks argues that these documents will not be offered as propensity evidence but as evidence of the G2 filter's design history. However, even if used for that limited purpose, the evidence is excludable under Rule 403. The evidence is emotionally inflammatory and there is a high likelihood that the jury will use the evidence for impermissible propensity reasons, notwithstanding instructions to the contrary.  The evidence also risks conducting a trial-within-a-trial on the Recovery, misleading the jury and causing undue delay. Courts in other remanded Bard IVC filter trials have reached the same conclusion. For example, in *Johnson v. C. R. Bard*, the Court stated: "A review of the CCP and the 2004 sales communiques show that they were created in response to deaths from migration of the Recovery Filter. Having decided that those deaths are not substantially similar to the incident in the present case, the court will not admit efforts to explain them away, however ham-handed the attempt, given the prejudicial confusion that would likely engender."[39]

To be clear, nothing in this decision prevents Banks from establishing the G2 filter's design history through other means or from showing, as Banks puts it, that "Bard was forced to make untested design changes and rush the G2 filter to market."[40] Indeed, bellwether cases involving Bard's later generation filters generally permitted evidence about the Recovery's complications, testing, and design—as opposed to marketing and communications—provided that such evidence excluded any mention of the migration

---

[38] *See id.*
[39] No. 19-CV-760-WMC, 2021 WL 2070448, at *3 (W.D. Wis. May 24, 2021).
[40] Rec. Doc. 149, p. 2.

deaths.[41] In one bellwether case, the court stated that the plaintiff would not be "seriously hampered in her ability to prove Recovery filter complications, testing, and design when references to cephalad migration deaths are removed"[42] and could "show what testing was done or not done on the G2 filter."[43] In short, Banks may admit evidence of the Recovery's complications, testing, and design to the extent it helps explain the G2's testing and design—however, she must do so without mention of the Recovery migration deaths or Bard's "ham-handed" attempt to explain away those deaths through its marketing and communications.

### C. Conclusion

For the foregoing reasons, Banks is not permitted to offer evidence of Recovery Filter Migration Deaths for any purpose, including to show notice. Banks is also prohibited from offering the CCP, sales communiques, and Greer email for any purpose. Defendants' *Motion in Limine to Exclude Testimony and Evidence of Recovery Filter Migration Deaths*[44] and *Motion in Limine to Exclude Recovery Filter Marketing, Communications, and other Irrelevant and Improper Propensity Evidence*[45] are hereby GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, this day, January 30, 2023.

_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[41] *See, e.g., In re Bard IVC Filters*, 2018 WL 1876896, at *1.
[42] *In re Bard IVC Filters*, 2018 WL 2124146, at *7.
[43] *Id.* at *3.
[44] Rec. Doc. 129.
[45] Rec. Doc. 136.